**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 19, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITEDNET LTD.; LEVI RUSSELL,

    Plaintiffs - Appellants,

v.

TATA COMMUNICATIONS AMERICA,
INC.; TATA COMMUNICATIONS
INDIA; TATA SONS PRIVATE, LTD.;
STEVEN LUCERO; LATINGROUP,
LLC,

    Defendants - Appellees.

No. 23-2057

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:21-CV-01081-KWR-JFR)**
_____

Scott Fuqua of Fuqua Law & Policy, P.C., Santa Fe, New Mexico, for Plaintiffs -
Appellants.

Douglas D. Janicik (Karl Tilleman with him on the brief) of Dentons US LLP, Phoenix,
Arizona, for Defendants - Appellees Steven Lucero and LatinGroup, LLC.

Philip D. Robben (Randall L. Morrison Jr. with him on the brief) of Kelley Drye &
Warren LLP, New York, New York, for Defendants - Appellees Tata Communications
India, Ltd. and Tata Sons Private, Ltd.

Katherine A. McNamara of Fraser Stryker PC LLO, Omaha, Nebraska, for Defendant -
Appellee Tata Communications America, Inc.

_____

Before **BACHARACH**, **McHUGH**, and **MORITZ**, Circuit Judges.
_____

**MORITZ**, Circuit Judge.

_____

This case arises from a foreign business deal gone wrong. In 2016, Unitednet, Ltd., a United Kingdom company, entered into an agreement to purchase a fiber-optic telecommunications network owned by three foreign companies that are part of a multinational conglomerate described in the complaint as the "Tata Communications empire." App. vol. 1, 3. But Steven Lucero, a New Mexico resident and key player in the deal, allegedly conspired with three other Tata companies to sink the deal so that he could purchase the network through his company based in New Mexico, LatinGroup, LLC. After the deal fell apart, Unitednet and its director, United Kingdom resident Levi Russell, filed this action in New Mexico federal district court. They asserted tortious interference with a contract and related claims against Lucero, LatinGroup, and the three Tata companies that allegedly participated in the conspiracy. But the district court dismissed the case under the doctrine of forum non conveniens, determining that the United Kingdom was a more appropriate forum for the litigation. Because the district court did not abuse its discretion in concluding that foreign law applies and that the private and public interests at stake favor dismissal for forum non conveniens, we affirm.

## Background

The facts of this case, as alleged in the complaint, describe a failed business deal that began in 2013, when Tata Sons Private, Ltd., an Indian investment holding

company, decided to sell all noncore assets of the Tata empire to pay down its debt.[1]

One such asset was a fiber-optic telecommunications network that runs from the

United Kingdom to the Netherlands. Through family connections to the Tata empire,

Lucero learned of the sale and agreed to purchase the network "at a price well below

market value" via his company, LatinGroup. *Id.* at 4. In early 2014, LatinGroup

formally entered into a preliminary agreement to purchase the network from three

foreign Tata companies—Tata Communications (UK) Ltd., Tata Communications

(Netherlands) B.V., and Tata Communications (Bermuda) Ltd. (together, Tata

sellers).

During the ensuing negotiations, however, Lucero changed plans and decided

to purchase the network through a separate corporate entity. To that end, Lucero

formed Unitednet in the United Kingdom and had LatinGroup assign its purchase

rights to Unitednet. Lucero also made Russell, a United Kingdom resident,

Unitednet's director and promised him an equity stake in the company as

compensation. Based on that promise, Russell spent the next several years working

on the deal.

But at some point, Lucero allegedly changed course yet again and decided to

sabotage the deal. Lucero realized that he would stand to gain if he could complete

---

[1] In reviewing the district court's forum non conveniens dismissal, we accept as true the well-pleaded allegations in the complaint unless they are contradicted by affidavits or other evidence. *See DIRTT Env't Sols., Inc. v. Falkbuilt Ltd.*, 65 F.4th 547, 550 (10th Cir.) (accepting factual allegations in complaint as true in reviewing forum non conveniens dismissal), *cert. denied*, 144 S. Ct. 197 (2023).

the purchase through LatinGroup, as originally planned, rather than through Unitednet. In an effort to sink the deal, Lucero allegedly "played a dual game in which he exerted near total control over the negotiations [between Unitednet and the Tata sellers] for the purchase of the [network]." *Id.* at 5. Lucero purported to represent Unitednet's interests "while at the same time working behind the scenes" with three other Tata companies—Tata Communications America, Inc., based in Virginia; Tata Communications India, Inc., based in India; and Tata Sons Private, the Indian investment holding company (together, Tata defendants)—to control the position of the Tata sellers. *Id.* In so doing, Lucero allegedly conspired with the Tata defendants to impose onerous terms on Unitednet, including a condition that Unitednet obtain a letter from a bank or investor showing that it had secured nearly $11 million in funding for the purchase.

In March 2016, after several years of negotiations, Unitednet and the Tata sellers entered into a sale-and-purchase agreement. The agreement contains the funding-letter requirement, which provides that Unitednet must produce the letter showing the securance of nearly $11 million in financing "within 30 days of written request by the Tata . . . [s]ellers." *Id.* at 145. It also contains a forum-selection clause stating that "[e]ach of the parties consents to the exclusive jurisdiction and venue of the [c]ourts of England and Wales in any suit or proceeding arising out of or relating to th[e a]greement or the transactions contemplated by th[e a]greement." *Id.* at 165. It additionally specifies that "[n]othing in th[e a]greement, express or implied, is intended to confer upon any [p]erson other than United[n]et or the Tata . . . [s]ellers

4

(or their successors or permitted assigns)[] any rights or remedies under or by reason of th[e a]greement." *Id.* at 163–64.

In April 2016, the Tata sellers requested that Unitednet produce the funding letter, but Unitednet failed to meet the 30-day deadline provided in the agreement. Eventually, after over a year without receipt of the requisite funding letter, the Tata sellers terminated the agreement.

Unitednet and Russell then filed this suit in the District of New Mexico against Lucero, LatinGroup, and the Tata defendants (but not the Tata sellers). Plaintiffs asserted claims against all defendants for tortious interference with contract, civil conspiracy, and quantum meruit. They also alleged breach of fiduciary duty against Lucero, as well as aiding and abetting breach of fiduciary duty against LatinGroup and the Tata defendants. Specifically, they asserted that Lucero took on responsibility for obtaining the required funding, but he repeatedly failed to do so and actively prevented Unitednet from securing financing.

Lucero and LatinGroup moved to dismiss the claims brought against them under the doctrine of forum non conveniens, arguing that the forum-selection clause in the agreement required plaintiffs to bring those claims in the United Kingdom. *See Atl. Marine Constr. Co. v. U.S. Dist. Ct. for the W. Dist. of Tex.*, 571 U.S. 49, 60 (2013) (explaining that procedurally, "the appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through the doctrine of forum non conveniens" (italics omitted)). The same day, Tata Communications America also moved to dismiss the claims brought against it for forum non conveniens.

The district court denied Lucero and LatinGroup's motion. It concluded that neither Lucero nor LatinGroup could enforce the forum-selection clause because they were not signatories to the agreement, and "the [a]greement expressly disclaims conferring any rights or remedies upon non[]signatory third parties." Supp. App. 71. But the district court granted Tata Communications America's motion. *Unitednet, Ltd. v. Tata Commc'ns Am., Inc.* (*Unitednet I*), No. 21-cv-01081, 2022 WL 1604802, at *17 (D.N.M. May 19, 2022). It determined that even though Tata Communications America also could not enforce the forum-selection clause, dismissal was appropriate under the typical forum non conveniens analysis because (1) the parties did not dispute that the United Kingdom was an appropriate and available alternative forum; (2) foreign law governs the claims; and (3) the private and public interests favor dismissal. *See Archangel Diamond Corp. Liquidating Tr. v. Lukoil*, 812 F.3d 799, 804 (10th Cir. 2016) (describing typical forum non conveniens analysis that applies when there is no valid and enforceable forum-selection clause). The district court conditioned the dismissal on Tata Communications America submitting to jurisdiction in the United Kingdom and waiving any statute-of-limitations defenses. And if the United Kingdom courts refused jurisdiction, plaintiffs could reinstate their claims. The district court also ordered plaintiffs to show cause why it should not dismiss the claims against the remaining defendants under the same analysis it had just applied to the claims against Tata Communications America.

In response to the show-cause order, plaintiffs asked the district court to reconsider its forum non conveniens analysis but did not otherwise object to the court

6

extending its analysis to the remaining claims. Plaintiffs also filed a one-paragraph motion to reconsider, which incorporated and referenced their response to the show-cause order. The district court denied plaintiffs' motion and conditionally dismissed the claims against the remaining defendants for forum non conveniens. *Unitednet, Ltd. v. Tata Commc'ns Am., Inc.* (*Unitednet II*), No. 21-cv-01081, 2023 WL 2665578, at *11 (D.N.M. Mar. 28, 2023). The district court imposed the same conditions it had placed on Tata Communications America, except that it did not require the two other Tata defendants—Tata Sons Private and Tata Communications India—to consent to jurisdiction in the United Kingdom (a condition they objected to).[2]

Plaintiffs appeal.

**Analysis**

Plaintiffs argue that the district court erred in dismissing the action for forum non conveniens. We review a forum non conveniens dismissal for abuse of discretion. *Lukoil*, 812 F.3d at 803. Under this standard, "we examine the district court's legal determinations de novo[] and its underlying factual findings for clear error." *Att'y Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 776 (10th Cir. 2009).

Forum non conveniens is a flexible, common-law doctrine that empowers a district court to decline jurisdiction over a case when another forum is better suited to adjudicate the dispute. *See Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507 (1947). The doctrine's "central purpose . . . is to ensure that the trial is convenient." *Piper*

---

[2] The district court also denied as moot motions filed by Tata Sons Private and Tata Communications India seeking dismissal for lack of personal jurisdiction.

*Aircraft Co. v. Reyno*, 454 U.S. 235, 256 (1981). Dismissal on forum non conveniens grounds "will ordinarily be appropriate where trial in the plaintiff's chosen forum imposes a heavy burden on the defendant or the court[] and where the plaintiff is unable to offer any specific reasons of convenience supporting [that] choice." *Id.* at 249.

When evaluating a motion to dismiss for forum non conveniens, a district court begins its analysis with two threshold questions. *Lukoil*, 812 F.3d at 804. First, the court asks "whether there is an adequate alternative forum in which the defendant is amenable to process." *Gschwind v. Cessna Aircraft Co.*, 161 F.3d 602, 605 (10th Cir. 1998). Second, it considers "whether foreign law applies." *Id.* If (and only if) "the answer to both questions is yes," the court then weighs a list of private and public interests to determine whether to dismiss for forum non conveniens. *Id.* at 605–06. Usually, the court applies "a strong presumption in favor of [a domestic] plaintiff's choice of forum" because "it is reasonable to assume that this choice is convenient" for the plaintiff. *Piper Aircraft*, 454 U.S. at 255–56. But "this assumption is much less reasonable" when, as here, the plaintiff is foreign. *Id.* at 256. So a foreign plaintiff's forum choice "deserves less deference."[3] *Id.*

---

[3] We pause to note that a valid and enforceable forum-selection clause alters the typical forum non conveniens analysis. *See Atl. Marine*, 571 U.S. at 63–64. When such a forum-selection clause is in play, the court gives no weight to the plaintiff's conflicting forum choice and considers only the public-interest factors, treating the private-interest factors as "weigh[ing] entirely in favor of the preselected forum." *Id.* And because the public-interest factors are "rarely" strong enough to override the preselected forum, "the practical result is that forum-selection clauses should control except in unusual cases." *Id.* at 64. But here, recall that the district court concluded

On appeal, plaintiffs do not dispute that the United Kingdom offers an adequate alternative forum. But they challenge the district court's choice-of-law determination that foreign law applies and its finding that the private- and public-interest factors favor dismissal.

## I.    Choice of Law

We first consider the threshold choice-of-law issue, which we review de novo. *Lukoil*, 812 F.3d at 804. To determine whether foreign or domestic law governs a case, a federal court sitting in diversity applies the choice-of-law rules of the forum state—here, New Mexico.[4] *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941). In New Mexico, courts follow a two-step process to resolve choice-of-law questions. *See Terrazas v. Garland & Loman, Inc.*, 142 P.3d 374, 377 (N.M. Ct. App. 2006). They first characterize "the area of substantive law—e.g., torts, contracts, domestic relations—to which the law of the forum assigns a particular claim or issue." *Id.* The courts then utilize the New Mexico choice-of-law rule applicable to the relevant area of law to determine which substantive law governs. *Id.*

---

the forum-selection clause in the agreement was not in play because defendants were not signatories to the agreement—the only signatories were the Tata sellers and Unitednet. The district court thus applied the typical forum non conveniens analysis.

[4] Plaintiffs' opening brief asserts that the district court's analysis of New Mexico's choice-of-law principles was "unnecessary" in this case because no other jurisdiction has "any interest in the application of its law to [their] claims." Aplt. Br. 7. But plaintiffs properly recognized, both in their reply brief and at oral argument, that whether foreign law governs turns on the application of New Mexico's choice-of-law principles. Indeed, "to determine whether American or foreign law governs," a district court "must conduct a choice[-]of[-]law analysis" under the choice-of-law rules of the forum state. *Needham v. Phillips Petrol. Co.*, 719 F.2d 1481, 1483 (10th Cir. 1983).

The parties in this case agree that all but one of plaintiffs' claims (the quantum meruit claim) sound in tort. In tort actions, "New Mexico courts follow the doctrine of *lex loci delicti commissi*," which directs courts to apply the substantive "law of the place where the wrong occurred." *Id.* Under this rule, the place of the wrong is "where the last event necessary to make an actor liable for an alleged tort takes place." Restatement (First) of Conflict of Laws § 377 (Am. L. Inst. 1934). And since "[a] tort is not complete until the plaintiff suffers a cognizable injury," that place is usually "'the location of the last act necessary to complete the injury.'" *Santa Fe Techs., Inc. v. Argus Networks, Inc.*, 42 P.3d 1221, 1229 (N.M. Ct. App. 2001) (quoting *Torres v. New Mexico*, 894 P.2d 386, 390 (N.M. 1995)).

Applying the place-of-the-wrong rule here, the district court held that foreign law applies to plaintiffs' tort claims.[5] The district court first noted that on the claims for tortious interference with contract, breach of fiduciary duty, and aiding and abetting that breach, the alleged injury was "financial loss and the loss of the benefits under the [a]greement." *Unitednet I*, 2022 WL 1604802, at *15; *see also Unitednet II*, 2023 WL 2665578, at *6. And on the civil-conspiracy claim, it was "the alleged interference with . . . Unitednet's acquisition of funding." *Unitednet I*, 2022 WL 1604802, at *15; *see also Unitednet II*, 2023 WL 2665578, at *7. The district court

---

[5] The district court also said that it would reach the same conclusion under the most-significant-relationship test, which it said New Mexico courts have sometimes applied in complex cases. Because the parties agree that the place-of-the-wrong rule governs here, we follow their lead and apply that rule. We thus need not address plaintiffs' argument that the district court erred by alternatively applying the most-significant-relationship test.

then determined that the last act necessary to complete these injuries was the termination of the agreement between plaintiffs and the Tata sellers. Although the complaint does not specify where the termination occurred, the district court explained that it "could only have been overseas," given that the Tata sellers are based in the United Kingdom, Bermuda, and the Netherlands. *Unitednet I*, 2022 WL 1604802, at *15; *see also Unitednet II*, 2023 WL 2665578, at *6. The district court thus concluded that the place of the wrong was overseas, requiring the application of foreign law.

Plaintiffs argue that the place of the wrong was actually New Mexico, where they assert defendants engaged in the tortious conduct, including "the last act of interference (or breach of fiduciary duty)."[6] Aplt. Br. 14. But plaintiffs' assertion runs counter to the rule that there is no tort without injury. *See Santa Fe Techs.*, 42 P.3d at 1229. Because defendants' alleged conduct did not become an actionable tort until plaintiffs suffered an injury, the place of the wrong was where plaintiffs' injury occurred, even if the conduct resulting in that injury took place elsewhere. *See id.*; *First Nat'l Bank v. Benson*, 553 P.2d 1288, 1289 (N.M. Ct. App. 1976) (noting that *lex loci delicti* doctrine requires application of "the law of the [s]tate of injury").

Plaintiffs nevertheless insist that, at least on the tortious-interference claim, they were injured when defendants took steps to ensure they could not perform their

---

[6] It bears noting, however, that only two of the five defendants reside in New Mexico—Lucero and LatinGroup. And plaintiffs point to nothing in the complaint suggesting the three Tata defendants engaged in any tortious conduct in that state.

11

obligations under the agreement. But the complaint does not allege that any injury resulted from such conduct until the termination of the agreement. Before that point, as defendants point out, "the fact that Unitednet did not secure the necessary funding to complete the asset purchase—which performance, in any event, was due in the [United Kingdom] (or overseas)—resulted in no actual [consequences] to United[net]." Aplee. Br. 23–24 (emphasis omitted). Indeed, the Tata sellers could have, for instance, excused plaintiffs' nonperformance by waiving the funding-letter requirement or otherwise negotiated changes to the agreement to accommodate Unitednet's financing issues. And had the Tata sellers done so, defendants' alleged attempt to induce the agreement's termination would have failed, such that plaintiffs would have suffered no injury. That is, plaintiffs would not have "los[t] the benefits of the [agreement]."[7] App. vol. 1, 27; *see also Gen. Assur. of Am., Inc. v. Overby-*

---

[7] After oral argument, plaintiffs filed a letter under Federal Rule of Appellate Procedure 28(j) in which they invoke Restatement (Second) of Torts § 766A (Am. L. Inst. 1979) to argue they need not show that the alleged interference actually induced a breach or termination of the agreement to establish tortious interference with a contract. Section 766A allows a plaintiff to bring a tortious-interference claim "on the ground that the defendant interfered with his contract by causing his performance to be 'more expensive or burdensome' even if the contract was not breached" or terminated. *Green Plains Trade Grp., LLC v. Archer Daniels Midland Co.*, 90 F.4th 919, 924–25 (7th Cir. 2024) (quoting § 766A). And plaintiffs cite an unreported district-court case predicting that the New Mexico Supreme Court, if presented with the issue, would adopt § 766A's broader definition of interference. *See Horizon AG-Prods. v. Precision Sys. Eng'g, Inc.*, No. 09-1109, 2010 WL 4054131, at *10 (D.N.M. Sept. 28, 2010). But plaintiffs have waived this § 766A argument by waiting until their Rule 28(j) letter to make it. *See Feinberg v. Comm'r*, 916 F.3d 1330, 1337 n.2 (10th Cir. 2019) ("[W]e generally refuse to consider any . . . new issue introduced for the first time in a reply brief, let alone in a Rule 28(j) letter." (alteration and omission in original) (quoting *Niemi v. Lasshofer*, 728 F.3d 1252, 1262 (10th Cir. 2013))). In any event, the complaint does not plead a § 766A claim (nor do plaintiffs

*Seawell Co.*, 533 F. App'x 200, 206 (4th Cir. 2013) (holding that under place-of-the-wrong rule, plaintiff's "alleged injury occurred in North Carolina, the place where [third party] terminated its contract with [plaintiff], which was the last event necessary to render [defendant] liable for" tortious interference with contract and breach of fiduciary duty).[8]

Resisting this line of reasoning, plaintiffs rely on a district-court decision, *Carroll v. Los Alamos National Security, LLC*, 704 F. Supp. 2d 1200 (D.N.M. 2010), *aff'd*, 407 F. App'x 348 (10th Cir. 2011), to argue that the last act necessary to render defendants liable here was "the tortious conduct itself." Aplt. Br. 16. But this reliance is misplaced. In *Carroll*, the plaintiff sued the administrator of an employee benefit plan for negligently misrepresenting that the plan he selected would provide reimbursement for certain contributions upon retirement. 704 F. Supp. 2d at 1202–05. The *Carroll* court noted that although the plaintiff, who had not yet retired, need not "have suffered calculable damages before the cause of action accrues, . . . 'there [is] no cause of action for negligence until there ha[s] been a resulting injury.'" *Id*. at 1221 (alterations in original) (quoting *Spurlin v. Paul Brown Agency, Inc.*, 454 P.2d

---

argue that it does). Instead, plaintiffs' tortious-interference claim proceeds on a theory that defendants induced the termination of the agreement, asserting that defendants "played an active and substantial part in causing [p]laintiff[s] . . . to lose the benefits of the contract." App. vol. 1, 27; *see also Wolf v. Perry*, 339 P.2d 679, 682 (N.M. 1959) ("A necessary element of the tort of inducing a breach [or in this case, termination,] of contract is a showing that the defendant played an active and substantial part in causing the plaintiff to lose the benefits of [the] contract.").

[8] We cite this unpublished case for its persuasive value. *See* Fed. R. App. P. 32.1(a); 10th Cir. R. 32.1(A).

963, 964 (N.M. 1969)). And in the *Carroll* court's view, the plaintiff had already suffered some injury: he "was forced to select his pension plan without being correctly informed about his options." *Id.* at 1223–24. But here, as discussed, plaintiffs fail to allege that they suffered any injury before the Tata sellers terminated the agreement.

Plaintiffs next invoke the New Mexico Supreme Court's decision in *Torres*, 894 P.2d 386, to argue that the last event necessary to give rise to liability must be the conduct of the tortfeasor, and not that of third parties like the Tata sellers. But *Torres* imposes no such requirement. There, the plaintiffs brought a wrongful-death action against the Albuquerque Police Department alleging that the department's failure to properly investigate a murder suspect allowed the suspect to escape to California, where he then shot and killed two individuals. *Id.* at 388–89. The New Mexico Supreme Court acknowledged that the shooting in California constituted the "last act necessary to complete the injury." *Id.* at 390. But it nevertheless held that New Mexico law should apply because "the duties of law[-]enforcement personnel are defined by [state law]," and "'[p]ublic policy dictates that New Mexico law determine[s] the existence of duties and immunities on the part of New Mexico officials.'" *Id.* (third alteration in original) (quoting *Wittkowski v. New Mexico*, 710 P.2d 93, 96 (N.M. Ct. App. 1985)). In other words, as the New Mexico Court of Appeals later put it, "*Torres* accept[ed] the general rule that New Mexico courts will apply the tort law of the state where the wrong occurred." *In re Gilmore*, 946 P.2d 1130, 1135 (N.M. Ct. App. 1997). But *Torres* declined to apply that rule under the

14

circumstances because "such application would [have] violate[d] New Mexico public policy." 894 P.2d at 390.

Here, plaintiffs do not contend that this international business dispute implicates New Mexico public-policy considerations requiring us to depart from the place-of-the-wrong rule. Rather, they argue that under this rule, New Mexico's substantive law governs. But for the reasons discussed, plaintiffs fail to convince us that the place of the wrong in this case was New Mexico. We instead agree with the district court that the place of the wrong was overseas, where the Tata sellers terminated the agreement, because the agreement's termination was the last event necessary to make defendants liable for the alleged torts. *See Santa Fe Techs.*, 42 P.3d at 1229.

In short, we see no error in the district court's conclusion that foreign law applies to plaintiffs' tort claims. And plaintiffs do not dispute that if foreign law governs "the vast majority of the underlying dispute," the threshold choice-of-law requirement is satisfied.[9] *Lukoil*, 812 F.3d at 806; *see also id.* ("[W]e have not . . . foreclose[d] consideration of forum non conveniens when some of the claims are

---

[9] Recall that the complaint asserts only one claim that does not sound in tort— quantum meruit. The district court did not definitively decide whether foreign law applies to this claim, concluding that even if New Mexico law were to apply, it "would still find dismissal for forum non conveniens appropriate, as the vast majority of the underlying dispute is subject to English law." *Unitednet II*, 2023 WL 2665578, at *7 (italics omitted); *see also Unitednet I*, 2022 WL 1604802, at *16. On appeal, plaintiffs do not address whether foreign law applies to their quantum meruit claim. And because plaintiffs do not argue that dismissing the case for forum non conveniens is inappropriate if New Mexico law applies to this single claim, we do not address it either.

based on U.S. law and some are based on foreign law. To do otherwise would allow a party to avoid a forum non conveniens dismissal simply by including a [domestic] claim . . . .").

## II.    Balance of Private and Public Interests

We now turn to the district court's analysis of the private-interest and public-interest factors. Our review of that analysis "is quite limited." *Yavuz v. 61 MM, Ltd.*, 576 F.3d 1166, 1172 (10th Cir. 2009). Under the abuse-of-discretion standard, "[w]e must 'carefully examine'" the district court's reasoning, "but where the [district] court 'has considered all relevant public[-] and private[-]interest factors, and where its balancing of these factors is reasonable, its decision deserves substantial deference.'" *Id.* at 1172–73 (quoting *Gschwind*, 161 F.3d at 606).

### A.    Private-Interest Factors

We begin with the private-interest factors, which concern the interests of those participating in the litigation. *See Gulf Oil*, 330 U.S. at 508. These factors include:

> (1) the relative ease of access to sources of proof; (2) availability of compulsory process for compelling attendance of witnesses; (3) cost of obtaining attendance of willing non[]party witnesses; (4) possibility of a view of the premises, if appropriate; and (5) all other practical problems that make trial of the case easy, expeditious, and inexpensive.

*Gschwind*, 161 F.3d at 606.

The district court found that the private interests favored a foreign forum, focusing on the location of the parties and witnesses. The district court noted that it appeared from the complaint that the parties and witnesses were "located all over the world." *Unitednet I*, 2022 WL 1604802, at *16; *see also Unitednet II*, 2023 WL

16

2665578, at *8. Indeed, the parties are based in the United States, the United Kingdom, and India. And the Tata sellers, "whose officers or employees are likely to be called as witnesses," are based in the United Kingdom, the Netherlands, and Bermuda. *Unitednet I*, 2022 WL 1604802, at *16; *see also Unitednet II*, 2023 WL 2665578, at *8. So if it were to retain the case, the district court determined, the presence of the parties and witnesses would likely require extensive travel to New Mexico from the United Kingdom, India, the Netherlands, and Bermuda—an inconvenient task that would cause the parties to incur significant expenses. To be sure, the district court acknowledged, neither party presented evidence that any witnesses could not be compelled or would be unwilling to attend a trial in New Mexico. But even so, the district court remained unconvinced that plaintiffs' suggestion of using "teleconferencing technology suffice[d] to mitigate the cost of travel and significant inconvenience that appear[ed] to favor litigation in the United Kingdom." *Unitednet I*, 2022 WL 1604802, at *16; *see also Unitednet II*, 2023 WL 2665578, at *8.

Plaintiffs argue that the district court's concerns about the costs associated with travel are misguided. They contend that the judicial system's response to the COVID-19 pandemic confirms it is possible to conduct an entire jury trial by videoconference, with every witness and attorney appearing remotely. And even if some did choose to appear in person, plaintiffs maintain, those for whom travel would be too disruptive and expensive could still appear remotely. Given this availability of videoconferencing technology, plaintiffs assert that the private-interest

factors "do[] not compel" dismissal here. Aplt. Br. 23.

But in evaluating the district court's exercise of discretion, we do not ask whether the private-interest factors *compel* dismissal. Rather, we examine whether the district court considered the relevant factors and reasonably balanced them. *See Yavuz*, 576 F.3d at 1172–73. And here, the district court explicitly considered the availability of videoconferencing technology but determined that the private-interest factors, on balance, still favored dismissal because the bulk of witnesses are located abroad. While plaintiffs disagree with the district court's analysis, they identify nothing unreasonable about it. We therefore conclude that the district court did not abuse its discretion in determining that the private-interest factors favored dismissal. *See id.*

### B.     Public-Interest Factors

That leaves us with the public-interest factors, which include:

(1) administrative difficulties of courts with congested dockets which can be caused by cases not being filed at their place of origin; (2) the burden of jury duty on members of a community with no connection to the litigation; (3) the local interest in having localized controversies decided at home; and (4) the appropriateness of having diversity cases tried in a forum that is familiar with the governing law.

*Gschwind*, 161 F.3d at 606.

The district court determined that the public-interest factors also favored dismissal. It explained that "the District of New Mexico face[s] a heavy criminal and civil docket," and retaining this case would present "significant administrative difficulties, such as assisting the parties in their efforts to obtain witnesses from

18

around the globe for depositions and trial." *Unitednet I*, 2022 WL 1604802, at \*17; *see also Unitednet II*, 2023 WL 2665578, at \*8. The district court acknowledged that the case has some connection to New Mexico, given that Lucero resides in the state and LatinGroup maintains its principal place of business there. But beyond those two defendants, the district court observed, the complaint does not allege any ties to the state or otherwise raise a local dispute. And without a dispute local to the New Mexico community, the district court saw little public interest in burdening the community with jury service. By contrast, the district court explained, the dispute has strong ties to the United Kingdom, which possesses a much more substantial interest in deciding a case that "concerns injury to [its] citizens," includes "an English contract," involves the acquisition of a telecommunications network connecting the United Kingdom and Netherlands, and "will require the application of laws of the United Kingdom or England." *Unitednet II*, 2023 WL 2665578, at \*8; *see also Unitednet I*, 2022 WL 1604802, at \*17. The district court thus concluded that the public-interest factors tipped in favor of litigation in the United Kingdom.

Plaintiffs insist otherwise, arguing that the public-interest factors weigh in favor of keeping the case in the District of New Mexico. In support, plaintiffs stress that they seek to apply New Mexico law to redress wrongful conduct engaged in by a New Mexico resident, his New Mexico company, and his three foreign coconspirators. But as explained above, the district court correctly concluded that foreign law, not New Mexico law, applies. And the district court recognized that two defendants reside in New Mexico but reasonably found that the United Kingdom has

19

much stronger ties to the case and a much greater interest in resolving it. Because the district court neither ignored nor unreasonably balanced the public-interest factors, we again find no abuse of discretion. *See Yavuz*, 576 F.3d at 1172–73.

In sum, there is no dispute that the United Kingdom is an adequate and available alternative forum, and the district court properly determined that foreign law governs this dispute. The district court then appropriately balanced the relevant private- and public-interest factors to conclude that they favored the United Kingdom as the more convenient forum. The district court thus acted within its discretion to dismiss the case for forum non conveniens.[10] *See id.*

## Conclusion

Because the district court did not abuse its discretion in dismissing this action for forum non conveniens, we affirm.

---

[10] Given this conclusion, we need not address defendants' alternative argument that the district court erred in concluding that they could not enforce the agreement's forum-selection clause. Nor do we consider their argument that the district court should have dismissed the claims against Tata Sons Private and Tata Communications America for lack of personal jurisdiction.